UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| SA HOSPITALITY GROUP, LLC, 1000 MADISON AVENUE LLC, ASTORIA CAKES LLC, CAFÉ FOCACCIA, INC., REALTEK LLC, SA MIDTOWN LLC, BAILEY'S RESTAURANT LLC, SA SPECIAL EVENTS, INC., SASE LLC, EIGHTY THIRD AND FIRST LLC, 265 LAFAYETTE RISTORANTE LLC, FELICE GOLD STREET LLC, SA 61ST MANAGEMENT LLC, SA YORK AVE LLC, SA THIRD AVE CAFÉ LLC, SABF LLC, FELICE CHAMBERS LLC, and FELICE WATER STREET LLC on behalf of themselves and all others similarly situated, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | No.  CLASS ACTION  **COMPLAINT**  DEMAND FOR JURY TRIAL  July 22, 2020 |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | |
| HARTFORD FIRE INSURANCE COMPANY, | ) ) ) ) | |
| Defendant. | ) | |

Plaintiffs SA Hospitality Group, LLC, 1000 Madison Avenue LLC, Astoria Cakes LLC, Café Focaccia, Inc., Realtek LLC, SA Midtown LLC, Bailey's Restaurant LLC, SA Special Events, Inc., SASE LLC, Eighty Third And First LLC, 265 Lafayette Ristorante LLC, Felice Gold Street LLC, SA 61st Management LLC, SA York Ave LLC, SA Third Ave Café LLC, SABF LLC, Felice Chambers LLC, and Felice Water Street LLC (together, "SA Plaintiffs" or "Plaintiffs"), by way of Complaint against Defendant Hartford Fire Insurance Company, ("Defendant" or "Hartford"), allege as follows:

## **INTRODUCTION**

1.      On March 11, 2020, World Health Organization ("WHO") Director General Tedros Adhanom Ghebreyesus declared the COVID-19 outbreak a worldwide pandemic: "WHO has been assessing this outbreak around the clock and we are deeply concerned both by the alarming levels of spread and severity, and by the alarming levels of inaction.  We have therefore made the assessment that COVID-19 can be characterized as a pandemic."[1]

2.      On March 13, 2020, President Trump declared the COVID-19 pandemic to be a national emergency.[2]  On March 16, 2020, the Centers for Disease Control and Prevention ("CDC"), and members of the national Coronavirus Task Force issued to the American public guidance, styled as "30 Days to Slow the Spread" for stopping the spread of COVID-19.  This guidance advised individuals to adopt far-reaching social distancing measures, such as working

---

[1]      *See* World Health Organization, *WHO Director-General's opening remarks at the media briefing on COVID-19 - 11 March 2020* (Mar. 11, 2020), https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020.

[2]      *See* The White House, *Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak* (Mar. 13. 2020), https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/.

from home, avoiding shopping trips and gatherings of more than ten people, and staying away from bars, restaurants, and food courts.[3]

3.    Following this advice for individuals to adopt far-reaching social distancing measures, many state government administrations across the nation recognized the need to take steps to protect the health and safety of their residents from the human to human and surface to human spread of COVID-19. As a result, many governmental entities entered civil authority orders suspending or severely curtailing business operations of non-essential businesses that interact with the public and provide gathering places for the individuals. Eventually, almost all states within the United States issued some sort of "stay-at-home" order and ordered private non-essential business operations to close.

4.    The result of these far-reaching restrictions and prohibitions has been catastrophic for most non-essential businesses, especially restaurants and other foodservice businesses, as well as retail establishments, entertainment venues, and other small, medium, and large businesses who have been forced to close, furlough employees, and endure a sudden shutdown of cash flow that threatens their survival.

5.    Restaurants provide economic benefits far beyond their own business. They are anchors to revitalizing down-and-out neighborhoods and can become a tourist attraction themselves, as well as a key part of the identity of smaller cities and large towns.[4]

---

[3]    *See The President's Coronavirus Guidelines for America, 30 Days to Slow the Spread,* WHITE HOUSE, https://www.whitehouse.gov/wp-content/uploads/2020/03/03.16.20_coronavirus-guidance_8.5x11_315PM.pdf (last visited Apr. 27, 2020).

[4]    Jennifer Steinhauer, et al., *As Restaurants Remain Shuttered, American Cities Fear the Future,* N.Y. TIMES (May 7, 2020), https://www.nytimes.com/2020/05/07/us/coronavirus-restaurants-closings.html?action=click&module=Top%20Stories&pgtype=Homepage (last visited July 2, 2020).

6.      In addition to their contribution to the national economy in providing jobs, restaurants are also vital to the national spirit because shared meals are an important mental relief. As Oscar Wilde noted, "After a good dinner, one can forgive anybody, even one's relations."

7.      Moreover, food is part of the national psyche.  As Anthony Bourdain noted, "Food is everything we are. It's an extension of nationalist feeling, ethnic feeling, your personal history, your province, your region, your tribe, your grandma. It's inseparable from those from the get-go."

8.      Most businesses, like Plaintiffs, secure all-risk commercial property insurance to protect themselves against losses from catastrophic events. These policies promise to indemnify the policyholder for actual business losses incurred when business operations are involuntarily suspended, interrupted, curtailed, when access to the premises is prohibited because of direct physical loss or damage to the property, or by a civil authority order that restricts or prohibits access to the property. This coverage is commonly known as "business interruption coverage" and is standard in most all-risk commercial property insurance policies, including those purchased by Plaintiffs and the putative Class members.

9.      Defendant, and most insurance companies who have issued all- risk commercial property insurance policies with business interruption coverage, are denying the obligation to pay for business income losses and other covered expenses incurred by policyholders for the physical loss and damage to the insured property from measures put in place by civil authorities.  This action seeks a declaratory judgment that affirms that the civil authority orders trigger coverage, have caused physical property loss the insured property, provide coverage for future civil authority orders that result in future suspensions or curtailments of business operations, and finds that Defendant is liable for the losses suffered by policyholders.

10.     In addition, this action brings a claim against Defendant for its breach of its contractual obligation under common all-risk commercial property insurance policies to indemnify Plaintiffs and others similarly situated for business losses and extra expenses, and related losses resulting from actions taken by civil authorities.

11.     Plaintiffs bring this action on behalf of a proposed class of policyholders who paid premiums in exchange for business insurance policies that included lost business income and extra expense coverage.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) in that this is a class action in which the amount in controversy exceeds $5,000,000, exclusive of interest and costs, and at least one member of the putative class is a citizen of a different State than that of Defendant.

13.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b) in that Defendant does business in this District and thus reside in this District, in accordance with 28 U.S.C. §1391(c).

14.     All conditions precedent to this action have occurred, been performed, or have been waived.

## PARTIES

15.     Plaintiff SA Hospitality Group, LLC is a New York limited liability company with its principal place of business in New York, New York.  It is a holding company that owns and operates a number of restaurants in New York and Florida through subsidiaries.  SA Hospitality Group's restaurants are dine-in restaurants, wine bars and cafes whose success depends upon patrons being able to consume the products offered at the respective facilities at that facility.

16.    Plaintiff 1000 Madison Avenue LLC is a New York limited liability company with its principal place of business in New York, New York, and is a subsidiary of SA Hospitality Group, LLC.

17.    Plaintiff Astoria Cakes LLC is a New York limited liability company with its principal place of business in New York, New York, and is a subsidiary of SA Hospitality Group LLC.

18.    Plaintiff Café Foccacia, Inc. is a New York corporation with its principal place of business in New York, New York, and is a subsidiary of SA Hospitality Group LLC.

19.    Plaintiff Realtek LLC is a New York limited liability company with its principal place of business in New York, New York, and is a subsidiary of SA Hospitality Group LLC.

20.    Plaintiff SA Midtown LLC is a New York limited liability company with its principal place of business in New York, New York, and is a subsidiary of SA Hospitality Group LLC.

21.    Plaintiff Bailey's Restaurant LLC is a New York limited liability company with its principal place of business in New York, New York, and is a subsidiary of SA Hospitality Group LLC.

22.    Plaintiff SA Special Events, Inc. is a New York limited liability company with its principal place of business in New York, New York, and is a subsidiary of SA Hospitality Group LLC.

23.    Plaintiff SASE LLC is a New York limited liability company with its principal place of business in New York, New York, and is a subsidiary of SA Hospitality Group LLC.

24.     Plaintiff Eighty Third And First LLC is a New York limited liability company with its principal place of business in New York, New York, and is a subsidiary of SA Hospitality Group LLC.

25.     Plaintiff 265 Lafayette Ristorante LLC is a New York limited liability company with its principal place of business in New York, New York, and is a subsidiary of SA Hospitality Group LLC.

26.     Plaintiff Felice Gold Street LLC is a New York limited liability company with its principal place of business in New York, New York, and is a subsidiary of SA Hospitality Group LLC.

27.     Plaintiff SA 61st Management LLC is a New York limited liability company with its principal place of business in New York, New York, and is a subsidiary of SA Hospitality Group LLC.

28.     Plaintiff SA York Avenue LLC is a New York limited liability company with its principal place of business in New York, New York, and is a subsidiary of SA Hospitality Group LLC.

29.     Plaintiff SA Third Avenue Café LLC is a New York limited liability company with its principal place of business in New York, New York, and is a subsidiary of SA Hospitality Group LLC.

30.     Plaintiff SABF LLC is a New York limited liability company with its principal place of business in New York, New York, and is a subsidiary of SA Hospitality Group LLC.

31.     Plaintiff Felice Chambers LLC is a New York limited liability company with its principal place of business in New York, New York, and is a subsidiary of SA Hospitality Group LLC.

32.     Plaintiff Felice Water Street LLC is a New York limited liability company with its principal place of business in Brooklyn, New York, and is a subsidiary of SA Hospitality Group LLC.

33.     Defendant Hartford Fire Insurance Company is a Connecticut corporation with its principal place of business in Hartford, Connecticut.

34.     Hartford issued to SA Plaintiffs Policy No. 13 UUN BL4042 K1 for the policy period between June 1, 2019 and June 1, 20020 (the "Policy").

## FACTUAL BACKGROUND

### A.     The Global COVID-19 Pandemic

35.     Viruses of the family Coronaviridae, such as Middle East respiratory syndrome (MERS) coronavirus (MERS-CoV) and severe acute respiratory syndrome (SARS) coronavirus (SARS-CoV), have been responsible for the loss of human life since at least 2002 and were identified in several animal hosts.[5]

36.     In December 2019, an initial cluster of patients with an unknown cause of viral pneumonia was found to be linked to the Huanan seafood market in Wuhan, China, where many

---

[5]     *See* Roujian Lu, et al., *Genomic characterisation and epidemiology of 2019 novel coronavirus: implications for virus origins and receptor binding*, CTR. FOR DISEASE CONTROL, (Jan. 29, 2020), https://www.cdc.gov/coronavirus/2019-ncov/downloads/genomic-characterization-of-2019-nCoV-Lancet-1-29-2020.pdf (As a typical RNA virus, the average evolutionary rate for coronaviruses is roughly $10^{-4}$ nucleotide substitutions per site per year, with mutations arising during every replication cycle.  This finding suggests that COVID-19 originated from one source within a short period and was detected rapidly.  However, as the virus transmits to more individuals, constant surveillance of arising mutations is needed. The fact that at least one patient had not visited the market suggests either possible droplet transmission or that the patient was infected by a currently unknown source. Evidence of clusters of infected family members and medical workers has now confirmed the presence of human-to-human transmission.).

non-aquatic animals such as birds were also on sale.  However, at least one of the patients never visited the market, though he had stayed in a hotel nearby before the onset of the illness.[6]

37.     By January 2020, genetic sequencing from patient samples was conducted to identify a novel virus, SARS-CoV-2, as the causative agent for the pneumonia cluster.[7]  SARS-CoV-2 is an RNA virus, with a crown-like appearance under an electron microscope because of glycoprotein spikes on its envelope.  Among the functions of the structural proteins, the envelope has a crucial role in virus pathogenicity as it promotes virus viral assembly and release.[8]

38.     The first confirmed case of the outside China was diagnosed on January 13, 2020, in Bangkok, Thailand with the number of cases exceedingly increasing worldwide.  On January 30, 2020, the WHO declared the SARS-CoV-2 outbreak constituted a public health emergency of international concern, and by February 11, 2020, the disease caused by SARS-CoV-2 was named "COVID-19" by the WHO Director-General.[9]  As of April 23, 2020, the WHO reported a confirmed 2.5 million cases of COVID-19 globally and over 170,000 deaths, with the United States dealing with more than 800,000 confirmed cases and 40,000 deaths – more than any other country.[10]

---

[6]     *See id*; Francesco Di Gennaro et al., *Coronavirus Diseases (COVID-19) Current Status and Future Perspectives a Narrative Review*, MDPI: INT'L J. ENVTL. RESEARCH & PUB. HEALTH, (Apr. 1, 2020), https://www.mdpi.com/1660-4601/17/8/2690 (There are four genera of coronaviruses: (I) α-coronavirus (alphaCoV) and (II) β-coronavirus (betaCoV), which are probably present in bats and rodents; and (III) δ-coronavirus (deltaCoV) and (IV) γ-coronavirus (gammaCoV), which probably represent avian species.).

[7]     *See* Di Gennaro, *supra* note 6.

[8]     *See id*. (To address the pathogenetic mechanisms of SARS-CoV-2, its viral structure and genome must be considered. Coronaviruses are enveloped positive strand RNA viruses with the largest known RNA genomes – 30-32 kb – with a 5'-cap structure and 3'-poly-A tail.).

[9]     *See id*.

[10]     *See Coronavirus disease 2019 (COVID-19) Situation Report – 94*, WORLD HEALTH

39.     The clinical features of COVID-19 vary from asymptomatic forms to fatal conditions of severe respiratory failure that requires ventilation and support in an intensive care unit ("ICU").  Pneumonia has been the most frequent severe manifestation of COVID-19, with symptoms of fever, cough, dyspnea, and bilateral infiltrates on chest imaging.[11]  There are no specific treatments recommended for COVID-19, and no vaccine is currently available; so understanding the complexities of COVID-19 is ongoing.[12]

40.     It has now been discovered by scientists that COVID-19 has several modes of transmission.  Pursuant to a "Situation Report" released by the WHO, the virus can be transmitted through symptomatic transmission, presymptomatic transmission, or asymptomatic transmission.[13]  Symptomatic transmission refers to transmission by an individual who is experiencing symptoms associated with the virus who then transfers COVID-19 to another individual.  Data from published studies provide evidence that COVID-19 is primarily transmitted

---

ORGANIZATION (Apr. 23, 2020) https://www.who.int/docs/default-source/coronaviruse/situation-reports/20200423-sitrep-94-covid-19.pdf?sfvrsn=b8304bf0_4.

[11]     *See* Di Gennaro, *supra* note 6 (Asymptomatic infections have also been described, but their frequency is unknown.  Other, less common symptoms have included headaches, sore throat, and rhinorrhea. Along with respiratory symptoms, gastrointestinal symptoms (*e.g.*, nausea and diarrhea) have also been reported, and in some patients, they may be the presenting complaint.).

[12]     *See id*. (The treatment is symptomatic, and oxygen therapy represents the major treatment intervention for patients with severe infection.  Mechanical ventilation may be necessary in cases of respiratory failure refractory to oxygen therapy, whereas hemodynamic support is essential for managing septic shock.  Different strategies can be used depending on the severity of the patient and local epidemiology.  Home management is appropriate for asymptomatic or paucisymtomatic patients.  They need a daily assessment of body temperature, blood pressure, oxygen saturation and respiratory symptoms for about 14 days. Management of such patients should focus on prevention of transmission to others and monitoring for clinical status with prompt hospitalization if needed.).

[13]     *See World Health Organization, Coronavirus disease 2019 (COVID-19) Situation Report – 73* (Apr. 3, 2020), https://www.who.int/docs/default-source/coronaviruse/situation-reports/20200402-sitrep-73-covid-19.pdf?sfvrsn=5ae25bc7_2.

from symptomatic people to others who are in close contact through respiratory droplets, by direct contact with infected persons, or by contact with contaminated objects and surfaces.[14]

41.    The incubation period for COVID-19, which is the time between exposure to the virus (becoming infected) and symptom onset, averages 5-6 days, however, it can be up to 14 days.[15]  During this period, also known as the "presymptomatic" period, some infected persons can be contagious.  For that reason, transmission from a presymptomatic case can occur before symptom onset.  Presymptomatic transmission still requires the virus to be spread through infectious droplets or touching contaminated surfaces.[16]

42.    An individual who does not develop symptoms, an asymptomatic case of COVID-19, can still transmit the virus to another.  Though there are few documented cases reported, it does not exclude the possibility that it has or may occur.[17]

43.    Not only is COVID-19 transmitted via human-to-human, but the WHO and scientific studies have confirmed that the virus can live on contaminated objects or surfaces. According to a study by scientists documented in *The New England Journal of Medicine*, COVID-19 was detectable in aerosols for up to three hours, up to four hours on copper, up to

---

[14]    *See id*. (Data from clinical and virologic studies that have collected repeated biological samples from confirmed patients provide evidence that shedding of the COVID-19 virus is highest in the upper respiratory tract (nose and throat) early in the course of the disease.  That is, within the first three days from onset of symptoms. Preliminary data suggests that people may be more contagious around the time of symptom onset as compared to later on in the disease.).

[15]    *See id.*

[16]    *See id*. (In a small number of case reports and studies, pre-symptomatic transmission has been documented through contact tracing efforts and enhanced investigation of clusters of confirmed cases. This is supported by data suggesting that some people can test positive for COVID-19 from 1-3 days before they develop symptoms. Thus, it is possible that people infected with COVID-19 can transmit the virus before significant symptoms develop.).

[17]    *See id.*

24 hours on cardboard, and up to two to three days on plastic and stainless steel.[18]  All of these materials are used in the preparation and service of food by restaurants.  The results of the study suggest that individuals could get COVID-19 through indirect contact with surfaces or objects used by an infected person, whether or not they were symptomatic.

44.    Another scientific study documented in the Journal *of Hospital Infection* found that human coronaviruses, such as SARS-CoV and MERS-CoV can remain infectious on inanimate surfaces at room temperature for up to nine days.[19]  At a temperature of 30 degrees Celsius or more, the duration of persistence is shorter.  Contamination of frequently touched surfaces is, therefore, a potential source of viral transmission.[20]  Though this study was not conclusive on COVID-19 itself, scientists are still grappling to understand this implication.

---

[18]    *See* News Release, *New coronavirus stable for hours on surfaces*, NAT'L INSTS. OF HEALTH (Mar. 17, 2020), https://www.nih.gov/news-events/news-releases/new-coronavirus-stable-hours-surfaces; *see also* World Health Organization, *Modes of transmission of virus causing COVID-19: implications for IPC* (Mar. 29, 2020), https://www.who.int/news-room/commentaries/detail/modes-of-transmission-of-virus-causing-covid-19-implications-for-ipc-precaution-recommendations (Airborne transmission of COVID-19 "may be possible in specific circumstances and settings in which procedures or support treatments that generate aerosols are performed; *i.e.*, endotracheal intubation, bronchoscopy, open suctioning, administration of nebulized treatment, manual ventilation before intubation, turning the patient to the prone position, disconnecting the patient from the ventilator, non-invasive positive-pressure ventilation, tracheostomy, and cardiopulmonary resuscitation.").

[19]    *See* G. Kampf et al., *Persistence of coronaviruses on inanimate surfaces and their inactivation with biocidal agents*, J. HOSPITAL INFECTION (Jan. 31, 2020), https://www.journalofhospitalinfection.com/action/showPdf?pii=S0195-6701%2820%2930046-3.

[20]    *See id*. (Although the viral load of coronaviruses on inanimate surfaces is not known during an outbreak situation, it seems plausible to reduce the viral load on surfaces by disinfection, especially of frequently touched surfaces in the immediate area surrounding a patient where the highest viral load can be expected.  The WHO recommends ensuring that "environmental cleaning and disinfection procedures are followed consistently and correctly.").

45.    On March 27, 2020, the CDC released a report entitled "*Public Health Responses to COVID-19 Outbreaks on Cruise Ships - Worldwide, February - March 2020.*"[21]    The report detailed that during this time frame, COVID-19 outbreaks associated with three different cruise ship voyages caused over 800 confirmed cases and ten deaths.[22]    Of the individuals tested, a high proportion were found to be asymptomatic, which may explain the high rates on cruise ships.    What is interesting about this study though, is that COVID-19 was identified on a variety of surfaces in cabins of both symptomatic and asymptomatic infected passengers up to 17 days after cabins were vacated on the Diamond Princess cruise line, but before disinfection procedures had been conducted.[23]    The CDC notes that more studies are required to understand the perpetuation of

---

[21]    *See* Leah F. Moriarty, MPH, *Public Health Responses to COVID-19 Outbreaks on Cruise Ships - Worldwide, February - March 2020*, CTRS. FOR DISEASE CONTROL & PREVENTION (Mar. 27, 2020), https://www.cdc.gov/mmwr/volumes/69/wr/mm6912e3.htm?s_cid= mm6912e3_w.

[22]    *See id.* ("During February 7-23, 2020, the largest cluster of COVID-19 cases outside mainland China occurred on the Diamond Princess cruise ship, which was quarantined in the port of Yokohama, Japan, on February 3. . . .    On March 6, cases of COVID-19 were identified in persons on the Grand Princess cruise ship off the coast of California; that ship was subsequently quarantined. By March 17, confirmed cases of COVID-19 had been associated with at least 25 additional cruise ship voyages. On February 21, CDC recommended avoiding travel on cruise ships in Southeast Asia; on March 8, this recommendation was broadened to include deferring all cruise ship travel worldwide for those with underlying health conditions and for persons [over] 65 years. On March 13, the Cruise Lines International Association announced a 30-day voluntary suspension of cruise operations in the United States. CDC issued a level 3 travel warning on March 17, recommending that all cruise travel be deferred worldwide.").

[23]    *See id.* ("Cruise ships are often settings for outbreaks of infectious diseases because of their closed environment, contact between travelers from many countries, and crew transfers between ships. On the Diamond Princess, transmission largely occurred among passengers before quarantine was implemented, whereas crew infections peaked after quarantine. . . .    On the Grand Princess, crew members were likely infected on voyage A and then transmitted [COVID-19] to passengers on voyage B. The results of testing of passengers and crew on board the Diamond Princess demonstrated a high proportion (46.5%) of asymptomatic infections at the time of testing. Available statistical models of the Diamond Princess outbreak suggest that 17.9% of infected persons never developed symptoms. . . .    A high proportion of asymptomatic infections could partially explain the high attack rate among cruise ship passengers and crew. . . .    Although these data cannot be used to determine whether transmission occurred from contaminated surfaces,

transmission, but what is clear is the uncertainty around COVID-19 and its implications for the lawful and safe functioning of a variety of businesses, most significantly, food service businesses.

46.    Without a vaccine to protect against COVID-19, effective control of the outbreak relies on measures designed to reduce human-to-human and surface-to-human exposure.  Recent information on the CDC's website provides that COVID-19 spreads when people are within six feet of each other or when a person comes in contact with a surface or object that has the virus on it.[24]  Various other sources state that close contact with a person with the virus or surfaces where the virus is found can transmit the virus.[25]

47.    The secondary exposure of the surface-to-humans is particularly acute in places where the public gathers typically to socialize, eat, drink, shop, be entertained, and go for recreation.  This is why the CDC recommends that in viral outbreaks individuals who are infected stay at home and those who are not sick engage in preventive measures such as constant hand washing and avoiding activities that would bring them into close proximity of people with the virus or surfaces where the virus may reside.  However, because these recommendations have proven ineffective to minimize the spread of COVID-19, containment efforts have led to civil authorities issuing orders closing many business establishments, including restaurants, bars, hotels,

---

further study of fomite transmission of [COVID-19] aboard cruise ships is warranted.").

[24]    *See* Centers for Disease Control and Prevention, *How COVID-19 Spreads*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-COVID-    spreads.html (last visited Apr. 27, 2020).

[25]    *See* Kampf, *supra* note 19 (remains infectious from two hours to 28 days depending on conditions); *see also* Nina Bai, *Why One Test May Not Be Enough*, UCSF (Feb. 13, 2020), https://www.ucsf.edu/news/2020/02/416671/how-new-coronavirus-spreads-and-progresses-and-why-one-test-may-not-be-enough  (door knobs and table tops can contain the virus); Heather Murphy, *Surfaces? Sneezes? Sex? How the Coronavirus Can and Cannot Spread*, N.Y. TIMES (Mar.  19,  2020),  https://www.nytimes.com/2020/03/02/health/coronavirus-how-it-spreads.html (virus can remain on metal and plastic for several days).

theaters, personal care salons, gyms, and schools, and mandating social distancing among the population.  This has caused the cancelation of sporting events, parades, and concerts, the closure of amusement parks, and substantial travel restrictions.  In addition, to conserve medical supplies, orders have been issued prohibiting the performance of non-urgent or non-emergency elective procedures and surgeries, forcing the suspension of operations at many medical, surgical, therapeutic, and dental practices.

48.    Such "stay-at-home" orders are or were in effect in all but five states: 35 states closed all non-essential businesses with other states enacting measures to curtail business operations; all 50 states closed schools; and all but one state closed restaurants and bars for services other than take-out and delivery (the "Closure Orders").[26]

**B.    Defendant's Standard Uniform All-Risk Commercial Property Insurance Policies**

49.    Hartford's insurance policies issued to Plaintiffs and the Class Members are "all risk" commercial property polices which cover loss or damage to the covered premises resulting from all risks other than those expressly excluded.

50.    Plaintiffs' Policy, as well as the policies of other Class Members, are standard forms that are used by Hartford for all insureds having applicable coverage.

**C.    Plaintiffs' Factual Allegations**

51.    Among the coverages provided by the Policy was business interruption insurance, which, generally, would indemnify Plaintiffs for lost income and profits in the event that their businesses were shut down.

---

[26]    *See* Kaiser Family Foundation, *State Data and Policy Actions to Address Coronavirus* (Apr. 27, 2020), https://www.kff.org/health-costs/issue-brief/state-data-and-policy-actions-to-address-coronavirus/.

52. SA Plaintiffs' Property Choice – Special Business Income Coverage Form (Business Interruption), Form PC 00 20 01 13 provided coverage as follows:

> We will pay up to the Special Business Income Business Income Limit of Insurance stated in the Property Choice Schedule of Premises and Coverages for the actual loss of Business Income you sustain the actual, necessary and reasonable Extra Expense you incur due to the necessary interruption of your business operations during the Period of Restoration due to direct physical loss of or direct physical damage to property caused by or resulting from a Covered Cause of Loss at "Scheduled Premises" where a limit of insurance is shown for Special Business Income. If you are a tenant, this Coverage applies to portion of the building which you rent, lease occupy, and extends to common service areas and access routes to your area.
> .

53. In addition SA Plaintiffs' Policy contained Property Choice Special Business Income – Additional Coverages, Form PC 26 02 01 13, which provides:

> This insurance is extended to apply to the actual loss of Business Income you sustain and the actual, necessary and reasonable Extra Expense you incur when access to your "Scheduled Properties" is specifically prohibited by order of a civil authority as the direct result of a Covered Cause of Loss to property in the immediate area of your "Scheduled Premises".

54. Under both SA Plaintiffs' Policy, Business Income is defined as:

a. Net Income (Net Profit or Net Loss before income taxes), including Income and Royalties, that would have been earned or incurred; and

b. Continuing normal operating expenses incurred, including Payroll Expenses.

55. Under the SA Plaintiffs' Property Choice Special Business Income – Additional Coverages form, Extra Expense is defined as:

> the actual, necessary and reasonable expenses you incur during the Period of Restoration that you would not have incurred if there had been no direct physical loss of or direct physical damage to property caused by or resulting from a Covered Cause of Loss at "Scheduled Premises".  We will pay Extra Expense (other than the expense to repair or replace property) to:

a. Avoid or minimize suspension of business and to continue operation at a "Scheduled Premises" or at replacement premises or temporary locations including relocation expenses and costs to equip and operate the replacement location or temporary location.

b.    Minimize the suspension of business if you cannot continue operations.  We will also pay Extra Expenses to repair or replace property, but only to the extent reduces the amount of loss that otherwise would have been payable under  the Coverage Form.

c.    Extra Expense Coverage does not apply to any expense related to any recall of products you manufacture, handle or distribute.

56.    In the SA Plaintiffs' Policy defines Causes of Loss in a separate form of the Policy, Property Choice – Covered Causes of Loss and Exclusions Form, Form PC 10 10 01 13.  A Covered Cause of Loss "means direct physical loss or direct physical damage that occurs during the Policy period and in the Coverage Territory unless the loss or damage is excluded or limited in this policy."

57.    The interruption of Plaintiffs' and other class members' businesses was not caused by any of the exclusions set forth in the applicable Policy.

58.    The Policy contains an endorsement entitled New York – Exclusion of Loss Due To Virus or Bacteria, Form PC 35 31 10 14, which provides:

We will not pay for loss or damage caused by or resulting from any virus, bacterium or other microorganism that induces or is capable of inducing physical distress, illness or disease.

59.    Plaintiffs and all similarly situated Class members have suffered a direct physical loss of their property because they have been unable to use their property for its intended purpose.

60.    The exclusion contained in the Virus and Bacteria endorsement is not applicable because Plaintiffs', and other class members', losses were not caused by a "virus, bacterium or other microorganism that induces or is capable of inducing physical distress, illness or disease", Rather, the predominant cause, and thus the efficient proximate cause of Plaintiffs', and other Class Members' losses, were the Closure Orders, not because coronavirus was found in or on Plaintiffs' insured property.

61.     Notwithstanding the foregoing, by way of letter dated April 8, 2020, the Hartford denied SA Plaintiffs' claim for business interruption losses under the Policy because their properties had not suffered any direct physical loss and because the losses were excluded by the bacteria and virus exclusion endorsement, and other exclusions which were not applicable to Plaintiffs' losses.

**D.     The Closure Orders Affected Policyholders Nationwide**.

62.     The Closure Orders are physically impacting, and have physically impacted, private commercial property throughout the United States and the State of New York, threatening the survival of thousands of restaurants, retail establishments, and other businesses that have had their business operations suspended or curtailed indefinitely by order of civil authorities.

63.     Hartford does not intend to cover losses caused by the Closure Orders as part of business interruption coverage.  As alleged above, Hartford denied Plaintiffs' claim, even though Plaintiffs were forced to close due to the Closure Orders.  On information and belief, Hartford has denied similar claims by other Class members across-the-board, a practice which is belied by not only the express terms of the insurance policies, but also: (a) the Small Business Administration's requirement that "reimbursement" from "business interruption insurance" be submitted along with an application for an Economic Injury Disaster Loan ("EIDL") loan;[27] and (b) America's SBDC, whose COVID-19 newsletter expressly states, "Business interruption insurance also applies if government actions cause operations to cease temporarily, which results in a loss for a firm."[28]

---

[27]     *Applying for SBA Disaster Loans (EIDL)* at 12, U.S. SMALL BUS. ADMIN. (Mar. 26, 2020), https://www.sba.gov/sites/default/files/articles/EIDL_Information_and_Documentation_-_3-30-2020_FINAL_2_pm.pdf (last visited Apr. 30, 2020).

[28]     *COVID-19: The Latest News and Resources for Your Business*, at 15, AMERICA'S SBDC (Mar. 20, 2020), https://www.dropbox.com/s/jcw2iw9vk2hcq9y/COVID%2019%20-%20Rev6.pdf?dl=0 (last visited Apr. 30, 2020).

64.    As a result, many small businesses that maintain commercial multi-peril insurance policies with business interruption coverage will have significant uninsured losses absent declaratory relief from this Court.  Indeed, even if state and local governments re-open, as some have, small businesses will almost certainly still be under social-distancing mandates and will continue to experience diminishing revenues due to the loss of covered property. These business also remain susceptible to future governmental decrees suspending or curtailing operations.

65.    A declaratory judgment determining that the business income loss and extra expense coverage provided in standard commercial property insurance policies applies to the suspension, curtailment, and interruption of business operations resulting from measures put into place by civil authorities is necessary to prevent Plaintiffs and similarly situated Class members from being denied critical coverage for which they have paid premiums.

## CLASS ACTION ALLEGATIONS

66.    Plaintiffs bring this lawsuit pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of themselves and all other persons similarly situated.

67.    The Nationwide Class is defined as:

> All entities who have entered into standard all-risk commercial property insurance policies with Hartford, where such policies provide for business income loss and extra expense coverage and do not exclude coverage for pandemics, and who have suffered losses due to measures put in place by civil authorities.

The New York Sub-Class is defined as:

> All entities who have entered into standard all-risk commercial property insurance policies with Hartford to insure property in New York, where such policies provide for business income loss and extra expense coverage and do not exclude coverage for pandemics, and who have suffered losses due to measures put in place by civil authorities.

Excluded from each class are the Defendant, its employees, officers, directors, legal representatives, heirs, successors, and wholly or partly owned subsidiaries or affiliated companies; Class Counsel and their employees; and the judicial officers and their immediate family members and associated court staff assigned to this case.

68.    Plaintiffs reserve the right to modify, expand, or amend the definitions of the proposed classes following the discovery period and before the Court determines whether class certification is appropriate.

69.    Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would prove those elements in individual actions alleging the same claims.

**<u>Numerosity</u>**

70.    This action satisfies the requirements of Fed. R. Civ. P. 23(a)(1). The Class numbers at least in the hundreds and consists of geographically dispersed business entities who are insured for business interruption losses. Hartford sells many insurance policies in the State of New York and most, if not all, other states and therefore joinder of the Class members is impracticable.

71.    The identity of Class members is ascertainable, as the names and addresses of all Class members can be identified in Hartford's or their agent's books and records. Plaintiffs anticipate providing appropriate notice to the certified Class in compliance with Fed.R.Civ.P. 23(c)(2)(A) and/or (B), to be approved by the Court after class certification, or pursuant to court order under Fed. R. Civ. P. 23(d).

**Typicality**

72.     This action satisfies the requirements of Fed. R. Civ. P. 23(a)(3) because Plaintiffs' claims are typical of the claims of each of the Class members, as all Class members were and are similarly affected and their claims arise from the same all-risk commercial property insurance policy provisions entered into with Hartford. Each Class member's insurance policy contains the same form providing coverage for business income loss. None of the forms exclude coverage due to a governmental action intended to reduce the effect of the ongoing global pandemic. As a result, a declaratory judgment as to the rights and obligations under Plaintiffs' Policy will address the rights and obligations of all Class members.

**Adequacy of Representation**

73.     Plaintiffs are committed to prosecuting the action, will fairly and adequately protect the interests of the members of the Class, and has retained counsel competent and experienced in class action litigation, including litigation relating to insurance policies.  Plaintiffs have no interests antagonistic to or in conflict with other members of the Class.  Plaintiffs anticipate no difficulty in the management of this litigation as a class action.

**Commonality**

74.     This action satisfies the requirements of Fed.R.Civ.P. 23(a)(2) because there are questions of law and fact that are common to each of the classes. These common questions predominate over any questions affecting only individual Class members. The questions of law and fact common to the Class include, but are not limited to:

a.      Whether there is an actual controversy between Plaintiffs and Hartford as to the rights, duties, responsibilities and obligations of the parties under the business interruption coverage provisions in standard all- risk commercial property insurance policies;

b.      Whether the Closure Orders are excluded from Plaintiffs' and the Class members standard all-risk commercial property insurance policies;

c.      Whether Closure Orders caused physical loss to covered commercial property;

d.      Whether Hartford has repudiated and anticipatorily breached the all-risk commercial property insurance policies the issued with business interruption coverage by intending to deny claims for coverage; and

e.      Whether Plaintiffs and the Class members suffered damages as a result of the anticipatory breach by Hartford.

**Superiority/Predominance**

75.      This action satisfies the requirements of Fed. R. Civ. P. 23(b)(3). A class action is superior to other available methods for the fair and efficient adjudication of the rights of the Class members. The joinder of individual Class members is impracticable because of the vast number of Class members who have entered into the standard all-risk commercial property insurance policies with the Defendant.

76.      Because a declaratory judgment as to the rights and obligations under the uniform all-risk commercial property insurance policies will apply to all Class members, most or all Class Members would have no rational economic interest in individually controlling the prosecution of specific actions. The burden imposed on the judicial system by individual litigation, and to Hartford, by even a small fraction of the Class members, would be enormous.

77.      In comparison to piecemeal litigation, class action litigation presents far fewer management difficulties, far better conserves the resources of both the judiciary and the parties, and far more effectively protects the rights of each Class member. The benefits to the legitimate interests of the parties, the Court, and the public resulting from class action litigation substantially outweigh the expenses, burdens, inconsistencies, economic infeasibility, and inefficiencies of individualized litigation. Class adjudication is superior to other alternatives under Fed. R. Civ. P. 23(b)(3)(D). Class treatment will also avoid the substantial risk of inconsistent factual and legal determinations on the many issues in this lawsuit.

78.     Plaintiffs know of no obstacles likely to be encountered in the management of this action that would preclude its maintenance as a class action. Rule 23 provides the Court with the authority and flexibility to maximize the efficiencies and benefits of the class mechanism and reduce management challenges. The Court may, on motion of Plaintiffs or on its own determination, certify nationwide and statewide classes for claims sharing common legal questions; use the provisions of Rule 23(c)(4) to certify particular claims, issues, or common questions of law or of fact for class-wide adjudication; certify and adjudicate bellwether class claims; and use Rule 23(c)(5) to divide any Class into subclasses.

### Rule 23(b)(2) Certification

79.     This action satisfies the requirements of Fed. R. Civ. P. 23(b)(2).  The prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudication with respect to individual Class members that would establish incompatible standards of conduct for the Defendant.

80.     In addition, the prosecution of separate actions by individual Class members would create a risk of adjudications with respect to them that would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudications, or substantially impair or impede their ability to protect their interests.

81.     Defendant has also acted or refused to act on grounds generally applicable to the Class as a whole, thereby making appropriate final declaratory and/or injunctive relief with respect to the members of the Class as a whole.

## COUNT I
## DECLARATORY JUDGMENT – BUSINESS INCOME COVERAGE
### (Claim Brought on Behalf of the National Class and New York Subclass)

82.     Plaintiffs repeat the allegations set forth in paragraphs 1-81 as if fully set forth herein.

83.     Plaintiffs bring this Count individually and on behalf of the other members of the National Class and New York Subclass.

84.     Plaintiffs' Hartford Policy, as well as those of the other Class Members, are contracts under which Hartford was paid premiums in exchange for its promise to pay Plaintiffs' and the other Class Members' losses for claims covered by the Policy.

85.     Plaintiffs and other Class Members have complied with all applicable provisions of the Policies and/or those provisions have been waived by Hartford or Hartford is estopped from asserting them, and yet Hartford has abrogated its insurance coverage obligations pursuant to the Policies' clear and unambiguous terms and has wrongfully and illegally refused to provide coverage to which Plaintiffs and Class Members are entitled.

86.     Hartford has denied claims related to Closure Orders on a uniform and class-wide basis, without individual bases or investigations, so the Court can render declaratory judgment no matter whether members of the Class have filed a claim.

87.     An actual case or controversy exists regarding Plaintiffs' and the other Class Members' rights and Hartford's obligations under the Policies to reimburse Plaintiffs and Class Members for the full amount of Business Income losses incurred by Plaintiffs and the other Class Members in connection with the suspension of their businesses stemming from the Closure Orders.

88.     Pursuant to 28 U.S.C. § 2201, Plaintiffs and the other Class Members seek a declaratory judgment from this Court declaring the following:

i.     Plaintiffs' and the other Class Members' Business Income losses incurred in connection with the Closure Order and the necessary interruption of their businesses stemming from those Orders are insured losses under their Policies; and

ii.    Hartford is obligated to pay Plaintiffs and other Class Members for the full amount of the Business Income losses incurred and to be incurred in connection with the Closure Orders during the period of restoration and the necessary interruption of their businesses stemming from those Orders.

<u>**COUNT II**</u>
**BREACH OF CONTRACT – BUSINESS INCOME COVERAGE**
**(Claim Brought on Behalf of the National Class and New York Subclasses)**

89.    Plaintiffs repeat the allegations set forth in paragraphs 1-81 as if fully set forth herein.

90.    Plaintiffs bring this Count individually and on behalf of the other members of the National Class and New York Subclass.

91.    Plaintiffs' Hartford Policy, as well as those of the other Class members, are contracts under which Hartford was paid premiums in exchange for its promise to pay Plaintiffs' and the other Class Members' losses for claims covered by the Policy.

92.    In the business interruption coverage, Hartford agreed to pay for its insureds' actual loss of Business Income sustained due to the necessary suspension of its operations during the "period of restoration."

93.    Hartford also agreed to pay for its insureds' actual loss of Business Income sustained due to the necessary "interruption of [their] operations" during the "Period of Restoration" caused by direct physical loss or damage.

94.    "Business Income" under the Policy means the "Net Income (Net Profit or Net Loss before income taxes), including Income and Royalties, that would have been earned or incurred", as well as "[c]ontinuing normal operating expenses incurred, including Payroll Expenses"

95.     The Closure Orders caused direct physical loss and damage to Plaintiffs' and the other Class Members' Covered Properties, requiring suspension of operations at the Covered Properties.  Losses caused by the Closure Orders thus triggered the Business Income provision of Plaintiffs' and the other Class Members' Hartford policies.

96.     Plaintiffs and the other Class Members have complied with all applicable provisions of their policies and/or those provisions have been waived by Hartford or Hartford estopped from asserting them, and yet Hartford has abrogated its insurance coverage obligations pursuant to the Policies' clear and unambiguous terms.

97.     By denying coverage for any Business Income losses incurred by Plaintiffs and other Class Members as a result of the Closure Orders, Hartford has breached its coverage obligations under the Policies.

98.     As a result of Hartford's breaches of the Policies, Plaintiffs and the other Class Members have sustained substantial damages for which Hartford is liable, in an amount to be established at trial.

## COUNT III
### DECLARATORY JUDGMENT – CIVIL AUTHORITY COVERAGE
#### (Claim Brought on Behalf of the National Class and New York Subclass)

99.     Plaintiffs repeat the allegations set forth in paragraphs 1-81 as if fully set forth herein.

100.    Plaintiffs bring this Count individually and on behalf of the other members of the National Class and New York Subclass.

101.    Plaintiffs' Hartford Policy, as well as those of the other Class Members, are contracts under which Hartford was paid premiums in exchange for its promise to pay Plaintiffs' and other Class members' losses for claims covered by the Policy.

102.    Plaintiffs and Class members have complied with all applicable provisions of the Policies and/or those provisions have been waived by Hartford or Hartford is estopped from asserting them, and yet Hartford has abrogated its insurance coverage obligations pursuant to the Policies' clear and unambiguous terms and has wrongfully and illegally refused to provide coverage to which Plaintiffs and Class Members are entitled.

103.    Hartford has denied claims related to the Closure Orders on a uniform and class wide basis, without individual bases or investigations, so the Court can render declaratory judgment no matter whether members of the Class have filed a claim.

104.    An actual case or controversy exists regarding Plaintiffs' and other Class Members' rights and Hartford's obligations under the Policies to reimburse Plaintiffs and other Class Members for the full amount of covered Civil Authority losses incurred by Plaintiffs and other Class Members in connection with Closure Orders and the necessary interruption of their businesses stemming from those Orders.

105.    Pursuant to 28 U.S.C. § 2201, Plaintiffs and other Class Members seek a declaratory judgment from this Court declaring the following:

i.    Plaintiffs' and other Class Members' Civil Authority losses incurred in connection with the Closure Orders and the necessary interruption of their businesses stemming from those Orders are insured losses under their Policies; and

ii.    Hartford is obligated to pay Plaintiffs and other Class members the full amount of the Civil Authority losses incurred and to be incurred in connection with the covered losses related to the Closure Orders and the necessary interruption of their businesses stemming from those Orders.

## COUNT IV
## BREACH OF CONTRACT – CIVIL AUTHORITY COVERAGE
### (Claim Brought on Behalf of the National Class and New York Subclasses)

106.    Plaintiffs repeat the allegations set forth in paragraphs 1-81 as if fully set forth herein.

107.    Plaintiffs bring this Count individually and on behalf of the other members of the National Class and New York Subclass.

108.    Plaintiffs' Policy, as well as those of the other Class Members, are contracts under which Hartford was paid premiums in exchange for its promise to pay Plaintiffs' and the other Class Members' losses for claims covered by the policy.

109.    Plaintiffs' Policy provided for "Civil Authority" coverage, which promises to pay "the actual loss of Business Income you incur and the actual, necessary and reasonable Extra Expense you incur when access to your 'Scheduled Properties' is specifically prohibited by order of a civil authority as the direct result of a Covered Cause of Loss to property in the immediate area of your 'Scheduled Premises'".

110.    The Closure Orders triggered the Civil Authority provision under Plaintiffs' and the other members of the Class' Hartford Policies.

111.    Plaintiffs and the other members of the Class have complied with all applicable provisions of the Policies and/or those provisions have been waived by Hartford or Hartford is estopped from asserting them, and yet Hartford has abrogated its insurance coverage obligations pursuant to the Policies' clear and unambiguous terms.

112.    By denying coverage for any business losses incurred by Plaintiffs and other members of the Class in connection with the Closure Orders, Hartford has breached its coverage obligations under the Policies.

113.    As a result of Hartford's breaches of the Policies, Plaintiffs and the other members of the Class have sustained substantial damages for which Hartford s liable, in an amount to be established at trial.

**COUNT V**
**DECLARATORY JUDGMENT – EXTRA EXPENSE COVERAGE**
**(Claim Brought on Behalf of the National Class and New York Subclass)**

114.    Plaintiffs repeat the allegations set forth in paragraphs 1-81 as if fully set forth herein.

115.    Plaintiffs bring this Count individually and on behalf of the other members of the National Class and the New York Subclass.

116.    Plaintiffs' Hartford Policy, as well as those of other Class Members, are contracts under which Hartford was paid premiums in exchange for its promise to pay Plaintiffs' and other Class Members' losses for claims covered by the Policy.

117.    Plaintiffs and other Class Members have complied with all applicable provisions of the Policies and/or those provisions have been waived by Hartford or Hartford is estopped from asserting them, and yet Hartford has abrogated its insurance coverage obligations pursuant to the Policies' clear and unambiguous terms and has wrongfully and illegally refused to provide coverage to which Plaintiffs and Class Members are entitled.

118.    Hartford has denied claims related to the Closure Orders on a uniform and class wide basis, without individual bases or investigations, so the Court can render declaratory judgment no matter whether members of the Class have filed a claim.

119.    An actual case or controversy exists regarding Plaintiffs' and other Class Members' rights and Hartford's obligations under the Policies to reimburse Plaintiffs and the other Class Members for the full amount of Extra Expense losses incurred by Plaintiffs and Class Members in connection with Closure Orders and the necessary interruption of their businesses stemming from those Orders.

120.     Pursuant to 28 U.S.C. § 2201, Plaintiffs and other Class Members seek a declaratory judgment from this Court declaring the following:

i.     Plaintiffs' and other Class Members' Extra Expense losses incurred in connection with the Closure Orders and the necessary interruption of their businesses stemming from those Orders are insured losses under their Policies; and

ii.     Hartford is obligated to pay Plaintiffs and other Class Members for the full amount of the Extra Expense losses incurred and to be incurred in connection with the covered losses related to the Closure Orders during the period of restoration and the necessary interruption of their businesses stemming from those Orders.

## COUNT VI
### BREACH OF CONTRACT – EXTRA EXPENSE COVERAGE
### (Claim Brought on Behalf of the National Class and New York Subclass)

121.     Plaintiffs repeat the allegations set forth in paragraphs 1-81 as if fully set forth herein.

122.     Plaintiffs bring this Count individually and on behalf of the other members of the National Class and New York Subclass.

123.     Plaintiffs' Hartford Policy, as well as those of the other Class Members, are contracts under which Hartford was paid premiums in exchange for its promise to pay Plaintiffs' and the other Class Members' losses for claims covered by the Policy.

124.     Plaintiffs' Policy provided that Hartford agreed to pay necessary Extra Expense that its insureds incur during the "period of restoration" that the insureds would not have incurred if there had been no direct physical loss or damage to the described premises. "Extra Expense" means expenses "to avoid or minimize the suspension of business and to continue 'operations,'" and to repair or replace property.

125.     Due to the Closure Orders, Plaintiffs and other members of the Class incurred Extra Expense at Covered Property

126.    Plaintiffs and other members of the Class have complied with all applicable provisions of the Policies and/or those provisions have been waived by Hartford or Hartford is estopped from asserting them, and yet Hartford has abrogated its insurance coverage obligations pursuant to the Policies' clear and unambiguous terms.

127.    By denying coverage for any business losses incurred by Plaintiffs and other members of the Class in connection with the Closure Order and Orders intended to mitigate the COVID-19 pandemic, Hartford has breached its coverage obligations under the Policies.

128.    As a result of Hartford's breaches of the Policies, Plaintiffs and the other members of the Class have sustained substantial damages for which Hartford is liable, in an amount to be established at trial.

**WHEREFORE**, Plaintiffs, on behalf of themselves and all similarly situated individuals, demand judgment against the Defendant as follows:

(1)    Declaring this action to be a proper class action maintainable pursuant to Fed. R. Civ. P. 23(a) and Rule 23(b)(3) and declaring Plaintiffs and their counsel to be representatives of the Class;

(2)    Issuing a Declaratory Judgment declaring the parties' rights and obligations under the insurance policies;

(3)    Awarding Plaintiffs and the Class compensatory damages from Hartford's breach of the insurance policies in an amount to be determined at trial, together with appropriate prejudgment interest at the maximum rate allowable by law;

(4)    Awarding Plaintiffs and the Class costs and disbursements and reasonable allowances for the fees of Plaintiffs' and the Class's counsel and experts, and reimbursement of expenses; and

(5)    Awarding such other and further relief the Court deems just, proper, and equitable.

**SEEGER WEISS LLP**
Attorneys for Plaintiffs
By:＿＿/s/ Christopher L. Ayers＿＿＿＿＿＿
CHRISTOPHER L. AYERS (CT29042)

Dated: July 22, 2020

Christopher A. Seeger
Christopher L. Ayers (CT29042)
SEEGER WEISS
55 Challenger Road, 6th Floor
Ridgefield Park, NJ 07660
(212) 584-0700

Stephen A. Weiss
SEEGER WEISS
77 Water Street, 8th Floor
New York, New York 10005
(212) 584-0700

James E. Cecchi
Lindsey H. Taylor
CARELLA, BYRNE, CECCHI
OLSTEIN, BRODY & AGNELLO
5 Becker Farm Road
Roseland, New Jersey 07068
(973) 994-1700

Samuel H. Rudman
ROBBINS GELLER RUDMAN
  & DOWD LLP
58 South Service Road, Suite 200
Melville, NY  11747
(631) 367-7100

Paul J. Geller
Stuart A. Davidson
ROBBINS GELLER RUDMAN
  & DOWD LLP
120 East Palmetto Park Road, Suite 500
Boca Raton, Florida 33432
(561) 750-3000

## DEMAND FOR A JURY TRIAL

Plaintiffs and the Class request a jury trial for all Counts for which a trial by jury is permitted by law.

**SEEGER WEISS LLP**
Attorneys for Plaintiffs
By:＿＿＿/s/ Christopher L. Ayers＿＿＿＿＿＿
CHRISTOPHER L. AYERS (CT29042)

Dated: July 22, 2020

Christopher A. Seeger
Christopher L. Ayers (CT29042)
SEEGER WEISS
55 Challenger Road, 6th Floor
Ridgefield Park, NJ 07660
(212) 584-0700

Stephen A. Weiss
SEEGER WEISS
77 Water Street, 8th Floor
New York, New York 10005
(212) 584-0700

James E. Cecchi
Lindsey H. Taylor
CARELLA, BYRNE, CECCHI
OLSTEIN, BRODY & AGNELLO
5 Becker Farm Road
Roseland, New Jersey 07068
(973) 994-1700

Samuel H. Rudman
ROBBINS GELLER RUDMAN
  & DOWD LLP
58 South Service Road, Suite 200
Melville, NY  11747
(631) 367-7100

Paul J. Geller
Stuart A. Davidson
ROBBINS GELLER RUDMAN
  & DOWD LLP
120 East Palmetto Park Road, Suite 500
Boca Raton, Florida 33432

(561) 750-3000